**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**LAFONSE DIXON,**

  **CASE NO. 2:16-CV-0251**

 **Petitioner,**    **Chief Judge Edmund A. Sargus, Jr.**
        **Magistrate Judge Kimberly A. Jolson**

 **v.**

**WARDEN, RICHLAND
CORRECTIONAL INSTITUTION,[1]**

 **Respondent.**

## REPORT AND RECOMMENDATION

  Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Petition, Respondent's Return of Writ, Petitioner's Reply, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

## I. FACTS AND PROCEDURAL HISTORY

### A. Facts, Trial, And Conviction

  The Ohio Fifth District Court of Appeals summarized the facts, trial, and conviction as follows:

> *Mark Bretz Stops to Help*
>
> This case arose around 8:00 a.m. on August 26, 2012, when Mark Bretz was returning home from an errand at Shirer's Meat Locker in Muskingum County, Ohio. Bretz's route took him back along State Route 208 near the intersection of Steel Hill Road.
>
> Bretz proceeded over a hill and observed something in the middle of the roadway that was not there when he first passed through. At first, Bretz believed it was a deer. As he slowed, the figure rose from the roadway and approached his truck. Bretz realized this was

---

[1] Respondent indicates that Margaret Bradshaw, Warden of the Richland Correctional Institution is the properly named Respondent in this case.

a human being. He would later describe the individual as "scorched" and badly beaten, completely naked, with skin hanging from her bones. The figure threw herself on the front of Bretz's truck, screaming "Help me; they're trying to kill me."

Bretz immediately called 911 and opened his truck door to assist the woman. He looked for anyone who might be in pursuit but saw no one. Bretz scooped the woman up and carried her to the side of the road, laying her in the grass. He gave her Gatorade to drink and held her hand, telling her help was on the way. The woman was able to speak indistinctly despite her terrible injuries. Bretz observed a tow strap around her neck and loosened it. He asked her what her name was, and she said "Celeste."

Investigators would later determine Celeste Fronsman traveled a third of a mile from the spot where she was choked, beaten, soaked with gasoline, and set on fire. Part of her journey took her through dense brush but somehow she made it to the center of State Route 208 to seek help and encountered Bretz.

Bretz asked Celeste where she was from, and she said "Canton." He asked who did this to her, and she responded "Katrina Culberson," " 'Fonse' Dixon," and "Washington." Bretz wrote Culberson's name on a piece of paper and gave it to law enforcement when they arrived.

Celeste was transported to the Wexner Medical Center at the Ohio State University and treated in the burn unit. Dr. Larry Jones testified Celeste had third- and fourth-degree burns covering 70 percent of her body; in 31 years of treating burn injuries, these were among the worst Jones had seen. He knew upon his initial examination her injuries would prove fatal. Doctors were able to resuscitate Celeste until family members could arrive, but further treatment would not be successful. Celeste was ultimately removed from a ventilator and succumbed to her injuries. The cause of death was determined to be complications of partial and full-thickness burns to 70 percent of her total body area.

In the immediate aftermath of Bretz's discovery in Muskingum County, detectives were on their way to Canton, Ohio, to find the people who killed Celeste.

*The Investigation Leads to Canton*

Katrina Culberson, known on the street as "K.C.," is a prostitute and drug addict who frequents an area known as the "Newton

2

Zone" in Canton, Ohio. The Newton Zone is known to police for prostitution, drug use, and drug sales. At the time of the murder of Celeste Fronsman, Culberson was addicted to heroin and crack cocaine. Culberson was also known to "control" other prostitutes in the sense that she set them up with "dates" using a website called Back Page. Culberson sometimes did "dates" with these prostitutes and took a portion of the money they earned. She was known to control prostitutes through violence and intimidation. Another prostitute testified she observed Culberson's prostitutes with black eyes and evidence of beatings.

One of the prostitutes Culberson controlled was Celeste Fronsman. Culberson was also Celeste's lover until August 2012. Their relationship was known to be fraught with violence; Culberson had beaten Celeste and threatened her in the past. Culberson also encouraged Celeste's drug habit with crack cocaine provided by Culberson's boyfriend: appellant, known as "Fonse."

Appellant sold crack cocaine and other drugs in his community, although witnesses insisted he did not use crack himself. Appellant had at least one other girlfriend, the mother of one of his children, with whom he lived, but he otherwise lived and associated with Culberson. Appellant knew Celeste and was aware of her relationship with Culberson.

Culberson's days were spent hanging around various Canton "flop houses" smoking crack and turning tricks. One of the "flop houses" appellant was known to sell drugs from was located at 502 Gilmore Avenue, Canton. Approximately two weeks before Celeste's murder, police raided the Gilmore house. Appellant rode by on a bicycle, saw the raid in progress, and warned Culberson to stay away.

*Culberson and Appellant Decide to Beat and Kill Celeste*

Appellant and Culberson came to believe Celeste had snitched to police and was responsible for the Gilmore raid. Culberson testified "Celeste was telling on a couple people." Celeste also owed Culberson money, which was often the source of violence in their relationship.

After the Gilmore raid, Culberson and appellant purportedly began to plot beating Celeste and killing her. Culberson told appellant she knew of a secluded place near Zanesville where "no one would find her." Culberson and appellant then embarked upon several weeks of chasing and terrorizing Celeste.

3

*Culberson and Appellant Stalk Celeste throughout Canton*

Shortly after the Gilmore raid, Culberson picked up Celeste and took her to the home of "Old Hooker Alice" where she brought Celeste into the bathroom and screamed at her, accusing her of snitching. Celeste denied it. Culberson and Celeste next went to the home of Ralph Horne, where they were joined by appellant. Culberson briefly left and upon her return appellant told her Celeste "got away," fleeing to a neighbor's house.

A neighbor of Ralph Horne testified that on August 12, 2012, a white female he didn't know burst into his home screaming that people were after her and she needed help. The neighbor reluctantly told the woman he would give her a ride and they got into his van. As they left, the woman said "they're over there" and a car started following them. The woman ducked down inside the van; a female in the pursuers' car looked inside the van and said "she's in there." The neighbor turned onto 15th Street and the pursuers cut him off, forcing him to stop. A black male and a white female got out of the pursuers' car and walked around the front of the neighbor's van. The woman inside was screaming; the neighbor put the van in reverse and took off again with the pursuers behind him, bumping his van. This time, the neighbor drove directly to the police department. Spotting an officer outside, the neighbor told an officer what happened; the officer scolded the woman for involving the neighbor in her drama and told her to get out of the van. The officer told the neighbor to go about his business.

The neighbor did not know any of the people involved. He later saw a newspaper article about the murder of Celeste Fronsman near Zanesville. The neighbor recognized Celeste as the woman who burst into his home asking for help and identified appellant as the black male who got out of the pursuers' vehicle.

Jimmy Fronsman is Celeste's father. He lives in the upstairs apartment of the residence of Howard Cammon on St. Elmo Street in Canton. Fronsman's St. Elmo address was the last known address for Celeste as well. Cammon knew Celeste, Culberson, and appellant. Sometime during the week before the murder, Culberson, appellant, and another woman named "Megan" came to Cammon's house asking if Celeste was home. Cammon said no and Megan asked to use the bathroom. Cammon was in the kitchen at the time, but came out to discover Culberson and Megan going through his house, opening doors and closets, looking for Celeste.

Cammon told them he wasn't lying about Celeste's whereabouts and told them to get out. Culberson threatened Celeste to Cammon, stating she was going to "get" her although he believed the threats were just "talk."

*August 26, 2012*

In the early morning hours of August 26, 2012, Culberson went to the home of Bobby Mann to buy crack cocaine. Monica Washington was asleep on a couch at Mann's; Washington is another prostitute and crack cocaine addict known to appellant, Culberson, and Celeste. Culberson kissed Washington on the forehead, waking her, and showed her a bag of crack. She asked Washington if she would drive around with her and smoke the crack. Washington agreed.

Culberson drove with Washington in the passenger seat of a tan Chevy Tahoe owned by Ralph Horne, another of Culberson's "boyfriends." At the intersection of Fulton and Tuscarawas in Canton, Washington spotted Celeste driving her father's blue Dodge truck with someone named Kenny Holmes. Washington pointed Celeste out to Culberson, and the pair chased Celeste to the parking lot of the Canton Wal–Mart. Culberson pulled up to Celeste's vehicle and told her she wasn't going to do anything to her; she just wanted to tell Celeste about a $900 "date" they could do together. Culberson got out of the Tahoe and into the Dodge; she told Washington to drive the Tahoe to the nearby McDonald's on Dueber Avenue to meet them.

Culberson also told Washington to activate the child locks on the rear doors of the Tahoe. The child locks prevent the rear doors from opening from the inside of the truck.

At McDonald's, Culberson told Holmes to "get lost." Celeste parked and locked her father's blue truck and got into the Tahoe with Culberson and Washington. Culberson called appellant on her cell phone and said only that she was "on her way," not wanting to alert Celeste that they were about to pick up appellant.

As they traveled with Culberson driving, Culberson told Washington Celeste "f——d [her] man" and Washington began hitting Celeste inside the truck. Culberson gave Washington pepper spray to use but Washington couldn't figure it out. The Tahoe stopped and picked up appellant at the home of Don Fox. When appellant got into the truck, according to Culberson, they

5

"looked at each other" with the understanding it was time to put their plan into action.

> *Appellant and Accomplices Take Celeste to "The Circle Place"*

Appellant got in the back with Celeste. Culberson was driving and Washington was in the front passenger seat. Appellant began hitting Celeste in the face and head, opening a gash on her face.

At first, Culberson planned to drive to West Virginia. She stopped at the home of Tammy Charlton, another prostitute and crack cocaine user, thinking Charlton would give them directions. Charlton wanted free crack, though, which Culberson and appellant were unwilling to provide. Charlton looked into the back of the Tahoe and saw Celeste on the floor, beaten and bloody. She told the group if they wanted to go to West Virginia they could buy a map and to "get the hell out."

The group drove around Canton with appellant and Washington beating Celeste inside the Tahoe. Eventually Culberson pulled onto Interstate 77 South and drove toward Zanesville. In the meantime, appellant and Washington bound Celeste's hands with a black belt and a roll of masking tape they found in the truck. Culberson stopped twice for gas, the second time at a Circle K in Dresden, Ohio, where Washington was captured on video putting gas in the Tahoe and buying a cookie.

Eventually the Tahoe reached "the circle place" in Muskingum County Culberson knew of. The beating and strangling continued. Appellant said "the circle place" was not secluded enough so they drove to another spot. Appellant, Culberson, and Washington beat Celeste and choked her with a piece of a tow strap around her neck. Finally, appellant told Culberson to get a can of gas from the back of the Tahoe. Culberson poured gasoline over Celeste and appellant gave her a lighter to set Celeste alight.

> *The Aftermath and Arrests*

Leaving Celeste behind, appellant, Culberson, and Washington snatched up the gas can and some papers that had fallen out of the Tahoe. They drove back to Canton and returned the Tahoe to Ralph Horne. Horne was angry upon their arrival because they made him late for work. Culberson ordered him to go out and clean the truck. When he did so, he observed blood on the back seat. He asked Culberson what she did and Culberson responded "I beat her

ass." Horne perfunctorily cleaned up the truck and went to work, dropping appellant at home on the way.

Culberson and Washington went to the home of Gerald Stuckey, another "boyfriend," to shower and smoke crack. Culberson collected their bloody clothes and disposed of them in a dumpster.

Appellant picked up Culberson and brought her to the home of Teddy Johnson, where she smoked crack for three days. While there, she learned police were looking for her. She was arrested three days after the murder on an outstanding warrant. Appellant and Washington were brought in for questioning as well. Culberson and Washington gave a number of false statements denying or minimizing their role in the murder.

Soon, though, Culberson was the first to broker a plea deal less than a month later, entering pleas of guilty to aggravated murder, kidnapping, and aggravated arson. Appellee recommended a sentence of life without the possibility of parole in exchange for her truthful testimony against appellant. Washington in turn pled to aggravated murder and aggravated arson and was offered life with the possibility of parole after 25 years in exchange for her truthful testimony.

Appellee's copious evidence at appellant's trial included the testimony of accomplices Culberson and Washington, plus that of many witnesses they came into contact with them throughout their campaign to terrorize, beat, and eventually kill Celeste Fronsman. Ralph Horne and his neighbor, Tammy Charlton, Don Fox, and Howard Cammon did not witness the murder itself but reluctantly corroborated details of the accomplices' stories of the days leading up to it. Appellee's case was replete with physical evidence, including the black belt, masking tape, and clothing used to bind Celeste. A soil expert testified the ground at the crime scene was positive for gasoline. Horne turned over the gas can. The Tahoe was examined and found to contain blood evidence. The tow strap around Celeste's neck was matched to a piece still inside the truck. DNA analysis established appellant could not be excluded as a depositor of DNA on the roll of masking tape used to bind Celeste's hands. An expert in analysis of cell phone records corroborated the calls placed amongst the accomplices and witnesses and tracked appellant's cell phone calls from Canton, south along Interstate 77, to Cambridge, Ohio and back. Those calls were placed between approximately 2:00 a.m. and 9:30 a.m. on the date of the murder.

Finally, Celeste herself provided the strongest evidence against her killers. She told Mark Bretz the people who did this to her were Katrina Culberson, "Fonse" Dixon, and "Washington."

### Indictment and Trial

Appellant was charged by indictment with one count of aggravated murder [Count I] pursuant to R.C.2903.01(A), including two capital specifications pursuant to R.C. 2929.04(A)(7). Appellant was also charged with one count of kidnapping [Count II] pursuant to R.C. 2905.01(A)(3), a felony of the first degree, and one count of aggravated arson [Count III] pursuant to R.C. 2909.02(A)(1), a felony of the first degree.

Appellant entered pleas of not guilty and filed a number of pretrial motions, most of which are not relevant to this appeal. Appellant filed a Motion to Suppress Photographs of the victim's body and appellee responded with a memorandum contra.

### Admission of Photographs of Celeste's Injuries

At the final pretrial, the trial court addressed a number of pending issues, including the photos appellee intended to introduce at trial. Appellee pared down the photos from 95 to 14 and reviewed them with defense trial counsel, then the trial court addressed objections.

Appellee's photo exhibits 1.1 and 1.2 were taken by a detective of Celeste at the scene as she was treated by medical personnel. The photos depict the victim as she was found by Mark Bretz. Appellant did not object to these exhibits.

Appellee's photo exhibits 65 through 71 are autopsy photos intended to be entered during the coroner's testimony. The photos show the extent and severity of the burns over 70 percent of Celeste's body; specific photos show her torso, her neck and face, her waist down, and her back. One autopsy photo depicts a subdural subgaleal hemorrhage on the skull. Another photo shows the victim's tongue with a bite mark resulting from trauma. Appellant objected to introduction of all autopsy photos (exhibits 65 through 71). The trial court sustained appellant's objection to exhibit 67.

Appellee's photo exhibits 72 through 76, the "treatment photos," were intended to be introduced during the testimony of Dr. Jones from the O.S.U. burn center to describe the severity of the individual burns to different regions of the body. Appellant did not

object to exhibits 72, 74, 75, and 76 but did object to exhibit 73 arguing the treatment photos are duplicative of the autopsy photos and unduly prejudicial. Appellee responded the photos selected were necessary to demonstrate the severity of the burns to establish the elements of aggravated arson pursuant to R.C. 2909.02, to demonstrate the extent of the victim's injuries while she was still alive, and to show the treatment she required including escharotomies. The trial court admitted exhibit 73 over objection.

*Juror 64*

Juror 64 first came to the parties' attention during voir dire when he stated he was familiar with the basic facts of this case from newspaper reports: the victim was found burnt and later died. He stated nothing he knew led him to any opinion as to appellant's guilt or innocence. He later acknowledged his cousin is a judge presiding over proceedings against one of the accomplices, but he and his cousin met infrequently and the relationship did not affect his ability to be fair. Finally, Juror 64 was asked by defense trial counsel whether he agreed a criminal defendant might have reasons not to testify in his own defense. Juror 64 responded the only reason he could think of was having something to hide. Upon further questioning, Juror 64 stated he would not necessarily think appellant had anything to hide and could "probably" put aside his feelings, although he admitted he was not sure he would be able to adhere to the presumption of innocence afforded appellant.

Defense trial counsel challenged Juror 64 for cause in light of the latter comment regarding the presumption of innocence. Appellee objected and the trial court advised it would question him further on these issues. Juror 64 stated he recognized the presumption of innocence but when asked if he could be fair and impartial if appellant decided not to testify, responded that it "depends" upon the questions asked. Juror 64 ultimately concluded, however, he would not hold the decision not to testify against appellant. Both parties were given the opportunity to question Juror 64 further about these issues and declined to do so.

Juror 64 was seated on the jury. During the testimony of the burn surgeon, at sidebar, the trial court told the parties Juror 64 appeared to be sleeping. Defense trial counsel stated Juror 64 was asleep during opening statements and the trial court observed the juror's head was "bobbing." Defense trial counsel also asked the trial court to admonish Juror 64 about speaking to other jurors, alleging during the jury view of the crime scene, Juror 64 was overheard telling another juror "this is where she came out."

At this point the trial court excused the jury and questioned Juror 64, who stated he was not falling asleep, just closing his eyes to aid concentration. He stated he heard all of the evidence and the trial court further admonished him not to discuss the case with other jurors. The trial court advised he would keep an eye on Juror 64 and noted the bailiff saw nothing untoward during the jury view. Defense trial counsel stated appellant had no objection to the trial court's handling of Juror 64.

Finally, during the testimony of accomplice Katrina Culberson the next day, the trial court again cleared the courtroom and advised the parties Juror 64 would be dismissed because the trial court observed him sleeping for eight minutes. The parties concurred and raised no objections. Juror 64 was brought into the courtroom, dismissed, and alternate juror number 65 was seated in his place.

*Conviction and Sentence*

Appellant was found guilty as charged and the case proceeded to the sentencing phase. Appellant presented a number of witnesses in mitigation. The jury spared appellant's life and recommended a term of life imprisonment without the possibility of parole. The trial court found Counts I and III (aggravated murder and aggravated arson) merged for sentencing purposes and followed the jury's recommendation, sentencing appellant to a term of life imprisonment without the possibility of parole plus 11 years on Count II, kidnapping.

*State v. Dixon*, No. CT2013-0055, 2014 WL 4748540, at *1-7 (Ohio App. 5th Dist. Sept. 18, 2014) (footnotes and paragraph symbols omitted).

## B. Direct Appeal

Petitioner appealed, raising five assignments of error:

I.     The trial court failed to record the seating of the entire jury panel in violation of state and federal statutory and constitutional guarantees. This is in violation of Appellant's Fifth Amendment right to due process made applicable to the states by the Fourteenth Amendment.

II.    Appellant was denied three peremptory challenges as guaranteed by Ohio Rule 24(G).

III.     Appellant was prejudiced by Juror sixty four who was speaking about the case with fellow jurors during the jury view. This violates Appellant's right to a fair and impartial jury as guaranteed by the Sixth Amendment to the Federal Constitution and made applicable to the states by the Fourteenth Amendment.

IV.     The trial court erred in permitting the jury to view pictures of the autopsy following objection by defense counsel. The use of these photos at trial also violates the Appellant's right to due process as guaranteed by the Fifth Amendment made applicable to the states by the Fourteenth Amendment to the Federal Constitution.

V.      Appellant was denied effective assistance of counsel as guaranteed by the Sixth Amendment to the Federal Constitution made applicable to the states by the Fourteenth Amendment.

*Dixon*, 2014 WL 4748540, at *1-7 (Ohio App. 5th Dist. Sept. 18, 2014) (footnotes omitted).  On

September 18, 2014, the appellate court affirmed Petitioner's conviction.  *Id.*  Petitioner then

sought discretionary review from the Supreme Court of Ohio, which was denied.  *State v. Dixon,*

142 Ohio St.3d 1448 (Ohio 2014).

### C.  State Post-Conviction Petition

On July 14, 2014, while his direct appeal was pending, Petitioner filed a petition to vacate

and set aside his conviction and sentence in the trial court, pursuant to Ohio Revised Code

§ 2953.21.  On August 20, 2014, the trial court denied the petition for untimeliness. (Doc. 8-1,

Ex. 24, PAGEID # 264).  He moved for reconsideration (Doc. 8-1, Ex. 25), and the court did not

rule on this motion.  Petitioner did not appeal.

### D.  Federal Habeas

On March 28, 2016, Petitioner filed the instant *pro se* petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  He asserts that the trial court unconstitutionally failed to record

the seating of the entire jury panel (claim one); that he was prejudiced by Juror Number 64, who

improperly discussed the case with other jurors (claim two); and that he was denied the effective

assistance of counsel because his attorney failed to call alibi or exculpatory witnesses (claim three).

## II.    DISCUSSION

### A.  Claim One:  Failure to Record the Seating of the Jury Panel

Respondent argues that claim one is procedurally defaulted.  In recognition of the federal and state courts' equal obligation to protect criminal defendants' constitutional rights and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the highest court of the state for consideration.  *See* 28 U.S.C. § 2254(b), (c).  If the petitioner fails to do so, but the state still provides a remedy to pursue, the petition is subject to dismissal for failure to exhaust state remedies.  *Id.*; *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004).  If, however, the petitioner no longer may present the relevant claims to a state court because of a procedural default, a federal court may not review the claim unless the petitioner can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error.  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Coleman,* 501 U.S. at 724; *Murray v. Carrier*, 477 U.S. 478, 485 (1986).

To determine whether procedural default bars a habeas petitioner's claim, courts in the Sixth Circuit engage in a four-part test.  *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also Scuba v. Brigano*, 259 F. App'x 713, 718 (6th Cir. 2007) (following the four-part analysis of *Maupin*).  First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.  Second, the court must determine whether the state courts actually enforced the state procedural sanction.  Third, the court must determine whether the forfeiture is an adequate and independent state

ground on which the state can rely to foreclose review of a federal constitutional claim. *Maupin*, 785 F.2d at 138. Finally, if "the court determines that a state procedural rule was not complied with and that the rule [has] an adequate and independent state ground, then the petitioner" may still obtain review of his or her claims on the merits if the petitioner establishes: (1) cause sufficient to excuse the default and (2) that he was actually prejudiced by the alleged constitutional error. *Id.* "Cause" under this test "must be something external to the petitioner, something that cannot fairly be attributed to him [, *i.e.*,] . . . some factor external to the defense [that] impeded [ ] efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753. This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level and to the failure to appeal at all. *Id.* at 750.

However, "'[i]n appropriate cases, the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray*, 477 U.S. at 495 (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982)). Petitioners who have not established cause and prejudice sufficient to excuse a procedural default may nonetheless obtain review of their claims if they can demonstrate that a court's refusal to consider a claim would result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *Lott v. Coyle*, 261 F.3d 594, 601–02 (6th Cir. 2001). The fundamental miscarriage of justice exception requires a showing that, "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

In claim one, Petitioner asserts that the trial court unconstitutionally failed to record the seating of the entire jury panel. Petitioner failed to make this objection at trial. Ohio has a contemporaneous objection rule under which a defendant who fails to object at trial waives later

appellate review of the issue unless plain error can be shown. *See Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004). Because Petitioner failed to object contemporaneously, the state appellate court reviewed claim one for plain error only:

> In his first assignment of error, appellant argues his convictions must be reversed because the trial court did not record the names of all twelve jurors empaneled. We disagree.
>
> First, we note appellant was provided with juror questionnaires identifying jurors by name and number, and the empaneled jurors' individual names are available on the verdict forms they signed. The jurors' identities are therefore in the record. It is not evident, and appellant does not explain, how appellant was prejudiced when alternate jurors selected were not specifically named as they were seated as alternates.
>
> Second, we note defense trial counsel did not object to the trial court's method of seating alternate jurors and we therefore review this matter for plain error. Pursuant to Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The rule places several limitations on a reviewing court's determination to correct an error despite the absence of timely objection at trial: (1) "there must be an error, i.e., a deviation from a legal rule," (2) "the error must be plain," that is, an error that constitutes an 'obvious' defect in the trial proceedings," and (3) the error must have affected "substantial rights" such that "the trial court's error must have affected the outcome of the trial." *State v. Dunn*, 5th Dist. No.2008–CA–00137, 2009–Ohio–1688, ¶ 89, citing *State v. Morales*, 10 Dist. Nos. 03–AP–318, 03–AP–319, 2004–Ohio–3391, ¶ 19 (citation omitted). The decision to correct a plain error is discretionary and should be made "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Barnes, supra*, quoting *State v. Long*, 53 Ohio St .2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.
>
> Appellant equates this case with *State v. Clinkscale*, 122 Ohio St.3d 351, 2009–Ohio–2746, 911 N.E.2d 862, ¶ 15, in which the Ohio Supreme Court reversed convictions because the trial court failed to record the out-of-court dismissal of a deliberating juror and found recording proceedings related to dismissal and replacement of a deliberating juror is of critical importance to protecting a defendant's constitutional rights, especially in capital

14

cases. But, the Court compared those circumstances to the failure to record "relatively unimportant portions of a trial," particularly when the defendant failed to demonstrate that (1) a request was made at trial that the proceedings be recorded or objections were made to the failures to record, (2) an effort was made on appeal to comply with App.R. 9 and to reconstruct what occurred or to establish its importance, and (3) material prejudice resulted from the failure to record the proceedings at issue. *Id.* at ¶ 13–15, citing *State v. Palmer*, 80 Ohio St.3d 543, 554, 687 N.E.2d 68 (1997).

We find the instant case has more in common with *State v. Palmer*, supra, than with *Clinkscale*, as observed by the Court, because recording the alternate jurors' names was not requested, no effort has been made to establish the importance of this omission, and appellant has not demonstrated material prejudice resulting therefrom. *Id.* Furthermore, when the name of an alternate juror became significant, *i.e.* when Juror 64 was replaced by Juror 65, the replacement juror's name was known to the parties as she was seated in the jury box and is in the record. Finally, as appellee points out with reference to *State v. Hill*, seating an anonymous jury does not necessarily implicate a fundamental right such that the outcome of the trial must be questioned as a result. 92 Ohio St.3d 191, 200, 2001–Ohio–141, 749 N.E.2d 274.

We find any omission in the record of the trial court's seating of alternate jurors does not rise to the level of plain error. Appellant's first assignment of error is overruled.

*State v. Dixon*, 2014 WL 4748540, at *8–9 (paragraph symbols omitted).

The Sixth Circuit has held that plain-error review does not constitute a waiver of the state's procedural default rules, *Seymour v. Walker*, 224 F.3d 542, 557 (2000), and any "alternative ruling on the merits [does] not remove the procedural default because 'a state court need not fear reaching the merits of a federal claim in an alternative holding,'" *Conley v. Warden Chillicothe Corr. Inst.*, 505 F. App'x 501, unpublished, 2012 WL 5861713, at *5 (6th Cir. 2012) (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998)).  Thus, it is clear that the state courts enforced a procedural rule to bar claim one, satisfying the first two *Maupin* factors.  As to the third factor, the Sixth Circuit has held that

15

Ohio's contemporaneous objection rule constitutes an adequate and independent state ground—barring federal review absent a showing of cause for the waiver and resulting prejudice.  *See Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004); *Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001); *Stojetz v. Ishee*, 2006 WL 328155 *12 (S.D. Ohio Feb. 10, 2006).  Accordingly, the first three *Maupin* factors are satisfied as to claim one.

Pursuant to the fourth *Maupin* factor, Petitioner still may secure review of his claims on the merits if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the constitutional violations that he alleges.

> "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

*Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003). Upon review of the record, the Court concludes that Petitioner has failed to establish cause and prejudice for his procedural default of claim one.

Finally, beyond the four-part *Maupin* analysis, this Court considers whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Murray v. Carrier,* 477 U.S. at 496; *see also Sawyer v. Whitley*, 505 U.S. 333, 339 (1992).  This case does not meet that high standard, and Petitioner's procedural default bars this Court from addressing claims one.

### B.  Claim Two:  Juror 64

In claim two, Petitioner asserts that he was denied a fair trial because Juror 64, who was the first cousin of the co-defendant's judge, had access to outside information regarding the case and improperly discussed the case with other jurors.  *See* Reply (Doc. No. 10, PageID# 1393.)

*1. Exhaustion*

As an initial matter, Respondent contends that Petitioner has waived claim two for review by failing to present the claim to the state courts as a federal constitutional issue.  Return of Writ (Doc. No. 8, PageID# 53.)  In order to satisfy the exhaustion requirement in habeas corpus, a petitioner must fairly present the substance of each constitutional claim to the state courts as a federal constitutional claim.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 275 (1971).  Although the fair presentment requirement is a rule of comity, not jurisdiction, *see Castille v. Peoples*, 489 U.S. 346, 349 (1989); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999), it is rooted in principles of federalism designed to allow state courts the opportunity to correct the State's alleged violation of a federal constitutional right that threatens to invalidate a state criminal judgment.  In the Sixth Circuit, a petitioner can satisfy the fair presentment requirement in any one of four ways: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.  *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  Further, general allegations of the denial of a constitutional right, such as the right to a fair trial or to due process, are insufficient to satisfy the "fair presentment" requirement.  *Id*.

Here, Petitioner argued that he was denied his "right to a fair and impartial jury as guaranteed by the Sixth Amendment to the Federal Constitution and made applicable to the states by the Fourteenth Amendment."  (Doc. No. 8-1, PageID# 116.)  Petitioner cited no state or federal cases in support of his claim but instead referred to portions of the trial transcript which, he argued, demonstrated that he was prejudiced by Juror 64's presence on the jury.  This Court

17

concludes that Petitioner presented his claim in sufficient terms to alert the state courts to the nature of the federal constitutional issue presented and therefore will consider the merits of this claim.

### 2.   Merits

Petitioner seeks habeas relief under 28 U.S.C. § 2254, the Antiterrorism and Effective Death Penalty Act ("AEDPA").  The United States Supreme Court recently described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, ⸺ U.S. ⸺, ⸺, 134 S.Ct. 10, 16 (2013) (quoting *Harrington v. Richter,* 562 U.S.786, ⸺, 131 S.Ct. 770, 786 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

Moreover, under AEDPA, the factual findings of a state court are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). Habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts. 28 U.S.C. § 2254(d)(1); *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)). *See also* 28

U.S.C. § 2254(d)(2) (requiring a petitioner to show that the state court relied on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding").  A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context.  *Id.* at 407.  The arduous burden of satisfying the standards set forth in § 2254 rests with the petitioner. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

In this case, the state appellate court rejected claim two as follows:

> In his third assignment of error, appellant argues his right to a fair and impartial jury was violated by the presence of Juror 64 on the panel before that juror was removed. We disagree.
>
> Crim.R. 24(B)(9) permits the court to refuse to disqualify a juror due to a preconceived opinion as to guilt or innocence if, after examination, the court believes the juror will render an impartial verdict. *State v. Iden*, 5th Dist. Licking No. 96–CA–88, unreported, 1996 WL 753206 (Dec. 12, 1996) at *3, citing *State v. Grubb*, 44 Ohio App.3d 94, 95, 541 N.E.2d 476 (1988). We review the trial court's decision for an abuse of discretion. *Id.* We have followed the holding of the Twelfth District Court of Appeals in *City of London v. Scurry,* wherein the Court stated:
>
> A party challenging a jury panel has the burden of showing that the jurors were either unlawfully empanelled or that the jurors cannot be fair and impartial. [ ]. Mere speculation as to bias among the pool of prospective jurors will not justify quashing the entire venire. [ ]. This court will not reverse a trial court's decision not to

> dismiss an entire jury panel absent an abuse of discretion. [ ]. (internal citations omitted).
>
> *State v. Feagin*, 5th Dist. Richland No. 05 CA 1, 2006–Ohio–676, at ¶ 23, appeal not allowed, 111 Ohio St.3d 1417, 2006–Ohio5083, 854 N.E.2d 1094, citing *City of London v. Scurry*, 12th Dist. Madison No. CA95–10–033, unreported, 1996 WL 406263 (July 22, 1996).
>
> Appellant argues Juror 64 poisoned the jury panel prior to his removal for three reasons: he demonstrated an inability to be fair and impartial, he is the cousin of the judge presiding over an accomplice's trial, and he allegedly spoke to other jurors during the jury view. We disagree with appellant's characterizations of Juror 64's responses to questions by the trial court. While he first indicated an inability to honor the presumption of innocence, upon further inquiry he stated he stated he could be fair and impartial and would not penalize appellant if he didn't testify. He further stated he rarely sees his cousin and has not discussed the case with him, and there is no evidence Juror 64 actually spoke to another juror during the jury view. Juror 64 was eventually removed for other reasons (sleeping) and the record contains no evidence he tainted the jury.
>
> Under these circumstances, we are unable to say the trial court's decision not to disqualify Juror 64 was unreasonable, arbitrary, or unconscionable. Appellant's third assignment of error is overruled.

*State v. Dixon*, 2014 WL 4748540, at *10 (paragraph symbols omitted).

When confronting an allegation of juror bias, the Court "must first look to whether the juror swore under oath 'that he could set aside any opinion he might hold and decide the case on the evidence,' and whether that 'protestation of impartiality' ought to be believed. *Hanna v. Ishee*, 694 F.3d 596, 616 (6th Cir. 2012) (citing *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)). "A state court's finding of impartiality is a factual determination entitled to 28 U.S.C. § 2254(e)'s presumption of correctness, *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003), and may 'be overturned only for 'manifest error.'" *Id.* (citing *Hill v. Brigano*, 199 F.3d 833, 843 (6th Cir. 1999) (quoting *Patton*, 467 U.S. at 1031).

"If a juror is found to have deliberately concealed material information, bias may be inferred. If, however, information is not concealed deliberately, the movant must show actual bias." *Williams*, 380 F.3d at 946 (emphasis in original) (quoting *Zerka v. Green*, 49 F.3d 1181, 1186 (6th Cir.1995)). To show actual bias, the defendant "must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc.* v. Greenwood, 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). "The motives for concealing information ... may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.*

*Id.* at 616.

Here, the state appellate court found that Juror 64 expressed his ability to be fair and impartial and stated that he would not penalize appellant if he chose not to testify. He rarely saw his cousin and had not discussed the case with him. In addition, no evidence in the record shows that Juror 64 actually spoke to another juror during the jury view. Juror 64 was eventually removed for other reasons (sleeping), and the record contains no evidence he tainted the jury. These factual findings are presumed to be correct, and Petitioner has failed to rebut that presumption of correctness. *See* 28 U.S.C. § 2254(e). The record accordingly fails to support Petitioner's claim that he was denied a fair trial based on juror bias, and claim two is without merit.

### C. Claim Three: Ineffective Assistance of Counsel

In claim three, Petitioner asserts that he was denied effective assistance of trial counsel for a variety of reasons. In his Petition, he claims that his counsel unconstitutionally failed to file a notice of alibi and failed to call exculpatory witnesses.[2] (Doc. No. 3, PageID# 24). In Reply,

---

[2] Petitioner does not identify the names of any potential defense witnesses; however, in his state post-conviction petition, Petitioner refers to his mother, Lisa Blakely Moore, and girlfriend, Amanda Lancaster, who stated that Petitioner was with them during the time at issue. (Doc. No. 8-1, PageID# 252-54.) Apparently their statements

he additionally asserts that his trial attorney unconstitutionally failed to object to hearsay testimony or the identification of him by a prosecution witness; permitted the admission of false and material evidence, and failed to object to testimony by co-defendants.  (Doc. No. 10, PageID# 1394).  Because Petitioner is pro se, the Court will consider the arguments raised for the first time in Reply.  The Court, however, concludes that Petitioner's ineffective assistance of counsel claim fails in its entirety.

### 1.  *Procedural Default*

Respondent argues Petitioner's ineffective assistance of counsel claim is procedurally defaulted.  The *Maupin* test, *see supra*, thus applies, and the Court concludes that much of Petitioner's ineffective assistance claim is procedurally defaulted.  First, Petitioner claims that his attorney failed to object to hearsay testimony or the identification of him by a prosecution witness; permitted the admission of false and material evidence; and failed to file a notice of alibi.  He failed, however, to raise these claims on direct appeal.  Though Petitioner raised an ineffective assistance of counsel claim, he did not make these particular arguments.  (*See* Doc. 8-1, Ex. 19, PageID #205–208).  "[T]o the extent that an ineffective assistance of counsel claim is based upon a different allegedly ineffective action than the claim presented to the state courts, the claim has not been fairly presented to the state courts."  *Caver v. Straub*, 349 F.3d 340, 346-47 (6th Cir. 2003).

Further, Ohio's doctrine of *res judicata* now bars his ability to raise such claims in the state courts.  *See State v. Perry*, 10 Ohio St.2d 175 (1967) (holding that claims must be raised on direct appeal, if possible, or they will be barred by the doctrine of *res judicata*.); *see also State v. Cole*, 2 Ohio St. 3d 112 (1982); *State v. Ishmail,* 67 Ohio St. 2d 16 (1981).  Ohio courts have

---

contradicted those provided to law enforcement.  *See State of Ohio's Response in Opposition to Defendant's Petition to Vacate or Set Aside Judgment of Conviction or Sentence Pursuant to ORC 2953.21* (Doc. No. 8-1, PageID# 261.)

consistently refused, in reliance on the doctrine of *res judicata*, to review the merits of procedurally barred claims.  *See State v. Cole*, 2 Ohio St.3d at 112; *State v. Ishmail*, 67 Ohio St.2d at 16.  Moreover, the Sixth Circuit has held that Ohio's doctrine of *res judicata* is an independent and adequate ground for denying federal habeas relief.  *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427–29 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 521–22 (6th Cir. 2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998).

Second, Petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to call exculpatory witnesses.  (Doc. No. 3, PageID# 24).  Petitioner raised this claim in his state post-conviction petition (Doc. 8-1, Ex. 21, PageID# 245–46), but the state trial court denied the petition as untimely (Doc. 8-1, Ex. 24, PAGEID # 264).  Petitioner failed to appeal.  Now, Petitioner may no longer appeal because Ohio prohibits delayed appeals in post-conviction proceedings.  *State v. Nichols*, 11 Ohio St.3d 40 (1984) ("[A] delayed appeal pursuant to App. R. 5(A) is not available in the appeal of a post-conviction relief determination [and] that post-conviction relief proceedings will be governed by the Ohio Rules of Appellate Procedure as applicable to civil actions.").  This procedural rule is an independent and adequate state ground to deny relief.  *See Nesser v. Wolfe*, 370 F. App'x 665, 2010 WL 1141006, at *4 (6th Cir. 2010) ("Ohio does not permit delayed appeals in postconviction proceedings, and this is an adequate and independent ground upon which to deny relief.") (citations omitted); *see also Carley v. Hudson*, 563 F. Supp. 2d 760 (N.D. Ohio 2008) (enforcing procedural default under such circumstances).

Accordingly, procedural rules—which Ohio enforces and are independent and adequate—bar these portions of Petitioner's ineffective assistance claim, and factors one through

three of the *Maupin* test are satisfied.  The fourth factor is also satisfied because Petitioner has failed to establish cause or prejudice.  *See Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003). Moreover, this is not an "extraordinary cause where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier,* 477 U.S. at 496

> ### 2.  Merits

Petitioner also asserts that counsel's failure to object to co-defendant testimony was constitutionally ineffective.  On direct appeal, Petitioner raised a Sixth Amendment claim based, in part, on counsel's failure to object to co-defendant testimony.  (Doc. 8-1, Ex. 15, PAGEID #122; Doc. 8-1, Ex. 19, PAGEID #205–06).  Accordingly, the Court will consider this claim on the merits.

Again, AEDPA's "formidable barrier" applies.  *Burt v. Titlow*, 134 S. Ct. at 16.  In addition, the "high bar" of *Strickland v. Washington*, 466 U.S. 668 (1984)—which governs ineffective assistance of counsel claims—controls.  *See Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).   The state appellate court (the last state court to provide a reasoned opinion) appropriately applied *Strickland*:

> To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test.   Initially, a defendant must show that trial counsel acted incompetently.  *See, Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).  In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy." Id. at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158 (1955).

> There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689.  The question is whether counsel acted outside the wide range of professionally competent assistance." *Id.* at 690.

> Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test.  Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

(Doc. 8-1, Ex. 17, PAGEID #188).

The appellate court went on to reject the claim, holding that the "[m]ere failure to object"—without citing specific instances where counsel should have objected—"is not enough to sustain a claim of ineffective assistance of counsel."  (Doc. 8-1, Ex. 17, PAGEID #186–88).  The appellate court also respected that is was a capital case, and counsel had "reason to be cognizant of the impression made upon the jury by frequent objections, above and beyond the general considerations attributed to trial strategy."  (*Id.*)  This was not an unreasonable application of *Strickland*, *see* 28 U.S.C. § 2254(d)(1), and the undersigned accordingly recommends dismissal.

## III.  RECOMMENDED DISPOSITION

For the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

### Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further

evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendati*on will result in a waiver of the right to have the district judge review the *Report* and *Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.


Date: November 21, 2016                                    /s/ Kimberly A. Jolson
                                                          Kimberly A. Jolson
                                                          United States Magistrate Judge